## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ERIN CANDLER, derivatively on behalf of XPO LOGISTICS, INC., | |
| | **C.A. No. _____** |
| Plaintiff, | |
| vs. | |
| BRADLEY S. JACOBS, JOHN J. HARDIG, GENE L. ASHE, MICHAEL G. JESSELSON, ADRIAN P. KINGSHOTT, JASON D. PAPASTAVROU, OREN G. SHAFFER, and LOUIS DEJOY, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| XPO LOGISTICS, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
## INTRODUCTION

Plaintiff Erin Candler ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant XPO Logistics, Inc. ("XPO" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Bradley S. Jacobs, John J. Hardig, Gene L. Ashe, Michael G. Jesselson, Adrian P. Kingshott, Jason D. Papastavrou, Oren G. Shaffer, and Louis DeJoy (collectively, the "Individual Defendants," and together with XPO, the

1

"Defendants") for breaches of their fiduciary duties as directors and/or officers of XPO, unjust enrichment, waste of corporate assets, and violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, she alleges the following based upon personal knowledge as to her and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding XPO, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by XPO's directors and officers from at least February 26, 2014 through the present (the "Relevant Period").

2.      XPO purports to be a top ten global provider of transportation and logistics services that provides "cutting-edge supply chain solutions to the most successful companies in the world." XPO operates globally through a network of people, technology, and physical assets. The Company has two reportable segments, Transportation and Logistics. Most of the Company's revenue is derived from its Transportation segment, which accounted for 65% of the Company's overall revenue in 2018. The Company touts itself as being "asset-light, with the revenue generated

by activities directly associated with our owned assets accounting for less than a third of our revenue in 2018."

3.      Prior to 2011, the Company was known as Express-1 Expedited Solutions, Inc. and functioned as a non-asset based premium transportation organization. In September 2011, the Company was purchased by Bradley S. Jacobs ("Defendant Jacobs") for over $150 million through an acquisition led by Defendant Jacobs' investment company, Jacobs Private Equity, LLC ("JPE"), and renamed XPO Logistics, Inc. Through the acquisition, JPE took 71% ownership of the Company and Defendant Jacobs became XPO's Chief Executive Officer ("CEO"), controlling shareholder, and Chairman of XPO's Board of Directors (the "Board"). Before XPO, Defendant Jacobs held a variety of high-level positions in a number of companies, including United Waste Systems, Inc. ("UWS"), which he founded in 1989 and United Rentals, Inc. ("URI"), which he co-founded in 1997. Both companies have been under fire in recent years for their involvement in accounting fraud.

4.      Upon taking control of the Company, Defendant Jacobs proceeded to engage in an aggressive mergers and acquisition growth strategy (the "M&A Strategy"), swiftly acquiring 17 companies over the next few years and deploying over $6 billion of capital.  As a result, XPO grew exponentially "from $177 million in sales in 2011 to $17 billion" by June 2018.[1] In August 2017, Defendant Jacobs maintained that the Company was ready to spend another $8 billion for additional acquisitions.

5.      Throughout the Relevant Period, XPO touted the M&A Strategy and the Company's accompanying fast-paced growth through its publicly issued financial statements. However, simultaneously, the Company's financial statements contained irregularities that

---

[1] http://fortune.com/future-50/xpo-logistics/. Last visited May 1, 2019.

conveniently disguised the Company's true financial state. Moreover, as the Individual Defendants continued to tout and promote XPO's growth and seeming success as a rising technology company, XPO would soon be exposed to claims of workplace misconduct and labor law violations— including, *inter alia*, through pregnancy discrimination and misclassifying employees as independent contractors. As XPO exponentially grew under Defendant Jacobs' lead, the Individual Defendants were engaging in and/or causing the Company to engage in certain improper accounting practices that placed Company in a better light than it actually was. These practices included underreporting bad debts, reporting phantom income through unexplained "Acquisition earn-out liabilities" and assuming aggressive amortization in order to make the Company appear more successful than it was and to further disguise increasing financial strain and the lack of internal controls over its business operations, reporting, and performance.

6.     On December 12, 2018, Spruce Point Capital Management LLC released a "scathing appraisal"[2] of XPO in an investment research report titled "Trucking Ridiculous; End of the Road" (the "Spruce Report"). The Spruce Report maintained that a "forensic investigation" into XPO uncovered numerous financial irregularities "that conveniently cover its growing financial strain and inability to complete additional acquisitions despite repeated promises." The Spruce Report also pointed out that while the Company had deployed over $6 billion of capital in connection with the M&A Strategy, it had only generated $73 million of cumulative adjusted free cash flow, "a paltry 1.2% return on invested capital."[3] Yet, the Spruce Report asserted that it had "concrete evidence to suggest" that, through "dubious tax accounting, under-reporting of bad debts, phantom income through unaccountable M&A earnout liabilities, and aggressive

---

[2] https://seekingalpha.com/news/3416823-spruce-point-capital-hammers-xpo-logistics. Last visited May 1, 2019.
[3] https://www.sprucepointcap.com/xpo-logistics-inc/. Last visited May 1, 2019.

amortization assumptions," XPO was able to "portray glowing Non-GAAP results[,]" promote itself, and distract the investing public from the Company's growing debt and failures to hit cash flow targets. The Spruce Report stated that it believed XPO was "executing an identical playbook to URI," which resulted in SEC investigation, executive felony convictions, and share price collapse when it was charged with engaging in fraudulent transactions to meet company earnings forecasts and analyst expectations in 2008.[4] Furthermore, the Spruce Report reported that "XPO insiders have aggressively reduced their ownership interest in the Company since coming public, and recently enacted a new compensation structure tied to 'Adjusted Cash Flow Per Share'— defined in such a non-standard way that it is practically meaningless."

7.      The Spruce Report also pointed out claims made by XPO employees about Defendant Jacobs and the Company's workplace practices through different unions representatives. Specifically, the Spruce Report contained numerous quotes by XPO workers claiming that the Company had engaged in repeated labor law violations, and that Defendant Jacobs had unjustly enriched himself through stock-bonus plans while workers were denied affordable health care. The Spruce Report also noted in its assessment of the Company, that XPO was "under investigation from the US Senate related to safety conditions for its workers," and that, furthermore, the Company's highly adjusted earnings per share was overstated and a result of "a combination of aggressive accounting, unsustainable pension gains, and poor practices that underpay workers and appear to cut corners on worker safety." In addition, the Spruce Report pointed out that XPO had experienced stoppages and pressure from the Teamsters Union, which added to the Spruce Report's negative assessment of XPO's future earnings potential.

---

[4] https://www.sec.gov/news/press/2008/2008-190.htm. Last visited May 1, 2019.

8.     On this news, the price per share of XPO stock fell $15.77, over 26%, from a closing price of $60.27 per share on December 12, 2018, to close at $44.50 on December 13, 2018.

9.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company's widely promoted M&A Strategy generated nominal returns to XPO; (2) the Company's financial statements were prepared with improper accounting methods employed to disguise the true state of the Company's financial condition, such as under-reporting bad debts and aggressive amortization assumptions; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

10.     The Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls and permitted the Company to engage in labor violations and employee mistreatment, which included exposing workers to unsafe conditions by requiring long working hours and limited breaks in non-conditioned warehouses leading to dehydration, and even death on one occasion, misclassifying drivers as independent contractors instead of employees, and allowing sexual harassment and pregnancy discrimination at Company-operated warehouses (the "Workplace Misconduct"). The Company is subject to numerous

lawsuits and administrative proceedings that claim, *inter alia*, that the Company misclassified employees as independent contractors, failed to fully compensate Company drivers or failed to provide meal and rest periods.

12.     In light of the Individual Defendants' misconduct, which has subjected XPO, its CEO, and its former CFO to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the District of Connecticut (the "Securities Class Action"), and subject XPO to various lawsuits based on the Workplace Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's CEO's and former CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

15.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

20.     Venue is proper in this District because XPO and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of XPO common stock and has continuously held XPO common stock at all relevant times.

### Nominal Defendant XPO

22.     XPO is a Delaware corporation with its principal executive offices at Five American Lane, Greenwich, CT, 06831. XPO's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "XPO."

### Defendant Jacobs

23.     Defendant Jacobs has served as the Company's CEO and as Chairman of the Board since September 2011 when he acquired the Company through JPE, the Company's largest stockholder. He is also the managing member of JPE and therefore a controlling shareholder of the Company. According to the Company's Schedule 14A filed with the SEC on April 22, 2019 (the "2019 Proxy Statement"), as of April 12, 2019, Defendant Jacobs beneficially owned 19,799, 601 shares of the Company's common stock, which represented 17.7% of the Company's outstanding shares of common stock on that date and 94.9% of the Company's Series A Preferred Stock.[5] Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, Defendant Jacobs owned over $1.2 billion worth of XPO stock. According to the Company's Annual Report filed on February 14, 2019 on a Form 10-K with the SEC for the fiscal year ended December 31, 2018 (the "2018 10-K"), Defendant Jacobs "controls a large portion of [Company] stock and has substantial control over [the Company], which could limit other stockholders' ability to influence the outcome of key transactions, including changes of control." The 2018 10-K further outlined in relevant part:

> Under applicable SEC rules, our Chairman and Chief Executive Officer, Mr. Bradley S. Jacobs, beneficially owns approximately 15% of our outstanding common stock as of December 31, 2018. This concentration of share ownership may adversely affect the trading price for our common stock because investors may perceive disadvantages in owning stock in companies with concentrated stockholders. Our preferred stock votes together with our common stock on an "as-converted" basis on all matters, except as

---

[5] These shares included the shares owned indirectly by Defendant Jacobs as the managing member of JPE and 263,887 shares of common stock held directly by Defendant Jacobs.

otherwise required by law, and separately as a class with respect to certain matters implicating the rights of holders of shares of the preferred stock. **Accordingly, Mr. Jacobs can exert substantial influence over our management and affairs and matters requiring stockholder approval, including the election of directors and the approval of significant corporate transactions, such as mergers, consolidations or the sale of substantially all of our assets. Consequently, this concentration of ownership may have the effect of delaying or preventing a change of control, including a merger, consolidation, or other business combination involving us, or discouraging a potential acquirer from making a tender offer or otherwise attempting to obtain control, even if that change of control would benefit our other stockholders.** Additionally, significant fluctuations in the levels of ownership of our largest stockholders, including shares beneficially owned by Mr. Jacobs, could impact the volume of trading, liquidity and market price of our common stock.

(Emphasis added.)

24.     For the fiscal year ended December 31, 2018, Defendant Jacobs received $13,327,471 in compensation from the Company. This included $625,000 in salary, $12,690,463 in stock awards, and $12,008 in all other compensation.

25.     The Company's 2019 Proxy Statement stated the following about Defendant Jacobs:

> Mr. Jacobs has served as our chief executive officer and chairman of our Board of Directors since September 2, 2011. Mr. Jacobs is also the managing member of JPE, which is our second largest stockholder. Prior to XPO, he led two public companies: United Rentals, Inc. (NYSE: URI), which he founded in 1997, and United Waste Systems, Inc., which he founded in 1989. Mr. Jacobs served as chairman and chief executive officer of United Rentals for that company's first six years, and as its executive chairman for an additional four years. He served eight years as chairman and chief executive officer of United Waste Systems.
>
> **Board Committees:**[6] None
> **Other Public Company Boards:**  None
>
> ***Mr. Jacobs brings to the Board:***
>
> ■ In-depth knowledge of the company's business resulting from his years of service with the company as its chief executive officer;

---

[6] Emphasis in original unless otherwise noted in this Complaint.

■ Leadership experience as the company's chairman and chief executive officer, and a successful track record of leading companies that execute strategies similar to ours; and

■ Extensive past experience as the chairman of the board of directors of several public companies.

### Defendant Hardig

26.     Defendant John J. Hardig ("Hardig") served as XPO's CFO from February 2012 until he stepped down from his position in August 2018. According to the 2019 Proxy Statement, as of February 21,2018, Defendant Hardig beneficially owned 115,598 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 21, 2018 was $93.99, Defendant Hardig owned approximately $10.8 million worth of XPO stock.

27.     For the fiscal year ended December 31, 2018, Defendant Hardig received $359,688 in compensation from the Company. This included $324,846 in salary and $34,842 in all other compensation.

### Defendant Ashe

28.     Defendant Gene L. Ashe ("Ashe") has served as a Company director since March 2016 and also serves as a member of the Audit Committee and the Acquisition Committee. Defendant Ashe has also served as vice-chairman of XPO Logistics Europe S.A., a majority owned subsidiary of the Company. According to the 2019 Proxy Statement, as of April 12, 2019, Defendant Ashe beneficially owned 8,757 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, Defendant Ashe owned approximately $553,354 worth of XPO stock.

29.     For the fiscal year ended December 31, 2018, Defendant Ashe received $272,192 in compensation from the Company. This included $80,645 in fees earned or cash paid and

$191,546 in stock awards. Defendant Ashe also received €65,000 in fees for her service as vice-chairman of the Supervisory Board of XPO Logistics, S.A.

30.     The Company's 2018 Proxy Statement stated the following about Defendant Ashe:

Ms. Ashe has served as a director of the company since March 21, 2016. Ms. Ashe has served as the president and chief executive officer of GLA Legal Advisory Group, LLC since February 2018. Also, Ms. Ashe has served as vice-chairman of the Supervisory Board of XPO Logistics Europe S.A., our majority-owned subsidiary, since February 2017. She was senior vice president, chief legal officer and corporate secretary of Adtalem Global Education Inc. (NYSE: ATGE) from May 2017 to February 2018, and executive vice president, chief legal officer, and corporate secretary of BrightView Landscapes, LLC (formerly The Brickman Group, Ltd. LLC) from December 2012 to June 2016. Earlier, she served as senior vice president of legal affairs for Catalina Marketing Corporation and held senior legal roles with the Public Broadcasting Service ("PBS"), Darden Restaurants, Inc., Lucent Technologies and AT&T. Earlier in her career, Ms. Ashe served as an electrical engineer and scientist for IBM Corporation before joining IBM's legal team. Ms. Ashe holds a juris doctorate degree from Georgetown University Law Center, where she serves on the Georgetown Law Advisory Board, a master's degree in electrical engineering from Georgia Institute of Technology and a bachelor's degree in mathematics from Spelman College, where she sits on the Board of Trustees. She has completed the executive development program at the Wharton School of the University of Pennsylvania and holds a certificate in international management from Oxford University in England.

**Board Committees:**
■ Member of Audit Committee
■ Member of Acquisition Committee

**Other Public Company Boards:**  None

*Ms. Ashe brings to the Board:*

■ More than two decades of valuable legal experience with public and private companies, which enables her to provide guidance to the Board and company management on legal matters, compliance and risk assessment and corporate governance best practices; and

■ An in-depth understanding of the dynamics of three of our most important customer verticals: e-commerce, technology and food and beverage.

**Defendant Jesselson**

31.    Defendant Michael G. Jesselson ("Jesselson") has served as a Company director since September 2011 and as lead independent director since March 2016. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of April 12, 2019, Defendant Jesselson beneficially owned 347,764 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, Defendant Jesselson owned approximately $21.9 million worth of XPO stock.

32.    For the fiscal year ended December 31, 2018, Defendant Jesselson received $291,546 in compensation from the Company. This included $100,000 in salary and $191,546 in stock awards.

33.    The Company's 2019 Proxy Statement stated the following about Defendant Jesselson:

> Mr. Jesselson has served as director of the company since September 2, 2011, and as lead independent director since March 20, 2016. He has been president and chief executive officer of Jesselson Capital Corporation since 1994. Mr. Jesselson served as a director of American Eagle Outfitters, Inc. (NYSE: AEO) from November 1997 to May 2017, most recently as its lead independent director. Prior to that, he worked at Philipp Brothers, a division of Engelhard Industries from 1972 to 1981, then at Salomon Brothers Inc. in the financial trading sector. He is a director of C-III Capital Partners LLC, Clarity Capital and other private companies, as well as numerous philanthropic organizations. Mr. Jesselson also serves as the chairman of Bar Ilan University in Israel. He attended New York University School of Engineering.

> **Board Committees:**
> ■ Member of Audit Committee
> ■ Member of Compensation Committee
>
> ■ Member of Nominating and Corporate Governance Committee

> **Other Public Company Boards:**  None

> *Mr. Jesselson brings to the Board:*

■ Significant experience with public company corporate governance issues through prior service on the board of directors of American Eagle Outfitters, including as its lead independent director; and

■ Extensive investment expertise.

**Defendant Kingshott**

34.     Defendant Adrian P. Kingshott ("Kingshott") has served as a Company director since September 2011. He also serves as Chairman of the Compensation Committee and as a member of the Acquisition Committee. According to the 2019 Proxy Statement, as of April 12, 2019, Defendant Kingshott beneficially owned 134,013 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, Defendant Kingshott owned approximately $8.4 million worth of XPO stock.

35.     For the fiscal year ended December 31, 2018, Defendant Kingshott received $281,546 in compensation from the Company. This included $90,000 in salary and $191,546 in stock awards.

36.     The Company's 2019 Proxy Statement stated the following about Defendant Kingshott:

> Mr. Kingshott has served as a director of the company since September 2, 2011. He has served as the chief executive officer of AdSon, LLC since October 2005, managing director of Spotlight Advisors, LLC since September 2015 and a member of the board of directors of Centre Lane Investment Corp. since May 2011. Mr. Kingshott was a senior advisor to Headwaters Merchant Bank from 2013 until June 2018. Previously, with Goldman Sachs, he was co-head of the firm's Global Leveraged Finance business and held other positions over a 17-year tenure. More recently, Mr. Kingshott was a managing director and portfolio manager at Amaranth Advisors, LLC. He is an adjunct professor of Global Capital Markets and Investments at Fordham University's Gabelli School of Business. He holds a master's degree in business administration from Harvard Business School and a master of jurisprudence degree from Oxford University.
>
> **Board Committees:**
> ■Chairman of Compensation Committee

14

■Member of Acquisition Committee

**Other Public Company Boards:**  None

*Mr. Kingshott brings to the Board:*

■ More than 25 years of experience in the investment banking and investment management industries; and

■ Expertise with respect to corporate governance, acquisition transactions, debt and equity financing and corporate financial management issues

**<u>Defendant Papastavrou</u>**

37.     Defendant Jason D. Papastavrou ("Papastavrou") has served as a Company director since September 2011. He also serves as a member of the Audit Committee, Compensation Committee, Acquisition Committee, and the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of April 12, 2019, Defendant Papastavrou beneficially owned 242,888 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, Defendant Papastavrou owned approximately $15.3 million worth of XPO stock.

38.     For the fiscal year ended December 31, 2018, Defendant Papastavrou received $281,546 in compensation from the Company. This included $90,000 in salary and $191,546 in stock awards.

39.     The Company's 2019 Proxy Statement stated the following about Defendant Papastavrou:

> Dr. Papastavrou has served as a director of the company since September 2, 2011. He founded ARIS Capital Management, LLC in 2004 and serves as its chief investment officer. Previously, Dr. Papastavrou was the founder and managing director of the Fund of Hedge Funds Strategies Group of Banc of America Capital Management (BACAP), president of BACAP Alternative Advisors, and a senior portfolio manager with Deutsche Asset Management. He was a tenured professor at Purdue University School of Industrial Engineering and holds a doctorate in

electrical engineering and computer science from the Massachusetts Institute of Technology. Dr. Papastavrou serves on the board of directors of United Rentals, Inc. (NYSE: URI).

**Board Committees:**

■ Chairman of Acquisition Committee

■ Member of Audit Committee

■ Member of Compensation Committee

■ Member of Nominating and Corporate Governance Committee

**Other Public Company Boards:**  United Rentals, Inc. (since 2005)

***Dr. Papastavrou brings to the Board:***

■ Financial expertise related to his qualifications as an "audit committee financial expert" under SEC regulations; and

■ Extensive experience with finance and risk-related matters, from holding senior positions at investment management firms.

### <u>Defendant Shaffer</u>

40.     Defendant Oren G. Shaffer ("Shaffer") has served as a Company director since September 2011. He also serves as Chairman of the Audit Committee. Defendant Shaffer has additionally served as a director for Terex Corporation since 2007.  According to the 2019 Proxy Statement, as of April 12, 2019, Defendant Shaffer beneficially owned 66,799 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 12, 2019 was $63.19, Defendant Shaffer owned approximately $4.2 million worth of XPO stock.

41.     For the fiscal year ended December 31, 2018, Defendant Shaffer received $291,546 in compensation from the Company. This included $100,000 in salary and $191, 546 in stock awards.

42.     The Company's 2019 Proxy Statement stated the following about Defendant Shaffer:

Mr. Shaffer has served as a director of the company since September 2, 2011. From 2002 to 2007, Mr. Shaffer was vice chairman and chief financial officer of Qwest Communications International, Inc. (now CenturyLink, Inc.). Previously, Mr. Shaffer was president and chief operating officer of Sorrento Networks, Inc., executive vice president and chief financial officer of Ameritech Corporation, and held senior executive positions with The Goodyear Tire & Rubber Company, where he also served on the board of directors. Additionally, Mr. Shaffer is a director on the board of Terex Corporation (NYSE: TEX). He holds a master's degree in management from the Sloan School of Management, Massachusetts Institute of Technology, and a degree in finance and business administration from the University of California, Berkeley.

**Board Committees:**
■ Chairman of Audit Committee
**Other Public Company Boards:** Terex Corporation (since 2007)

***Mr. Shaffer brings to the Board:***
■ Senior financial, operational and strategic experience with various large companies;

■ Corporate governance expertise from serving as director of various public companies; and

■ Financial expertise related to his qualifications as an "audit committee financial expert" under SEC regulations.

### Defendant DeJoy

43.    Defendant Louis DeJoy ("DeJoy") served as a Company director from December 2015 until May 2018. While with the Company, he served as a member of the Acquisition Committee. He also served as the CEO of the Company's supply chain business in the Americas until December 2015 and was chairman and CEO of New Breed Logistics, which the Company acquired in 2014. According to the Company's Schedule 14A filed with the SEC on April 18, 2018, (the "2018 Proxy Statement"), as of April 6, 2018, Defendant DeJoy beneficially owned 1,134,686 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 6, 2018 was $96.23, Defendant DeJoy owned approximately $109.1 million worth of XPO stock.

44.     For the fiscal year ended December 31, 2017, Defendant DeJoy received $248,489 in compensation from the Company. This included $75,00 in fees earned or cash paid and $173,489 in stock awards.

45.     In addition, the Company leases office space from three entities partially owned and controlled by Defendant DeJoy. For the year ended December 31, 2018, the Company made aggregate rent payments of $1.86 million on these lease agreements.

46.     The Company's Schedule 14A filed with the SEC on April 17, 2017 (the "2017 Proxy Statement") stated the following about Defendant DeJoy:

> Mr. DeJoy has served as a director of the company since December 3, 2015. He was most recently chief executive officer of the XPO Logistics supply chain business in the Americas (retired as of December 7, 2015). Previously, he led New Breed Logistics as its chairman and chief executive officer from 1983 until XPO Logistics acquired New Breed in 2014. During that time, he grew the company from a small, regional operation to a leading U.S. provider of highly engineered, technology-driven contract logistics solutions. Mr. DeJoy is a member of the boards of trustees of Elon University and the PGA Wyndham Championship, and serves on the board of directors for The Fund for American Studies in Washington, DC. He is a past member of the board of trustees of Moses Cone Health System in North Carolina, and was an appointee to the President's Commission on White House Fellowships. He holds a business degree from Stetson University.

> **Board Committees**:

> • Member of Acquisition Committee

> **Other Public Company Boards**: None

> ***Mr. DeJoy brings to the Board***:

> • Significant expertise in supply chain operations that allows him to provide valuable guidance to our Board on strategic and operational matters with respect to our logistics business unit.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47.     By reason of their positions as officers and/or directors of XPO  and because of their ability to control the business and corporate affairs of XPO, the Individual Defendants owed

XPO and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage XPO in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of XPO and its shareholders so as to benefit all shareholders equally.

48.     Each director, officer, and controller of the Company owes to XPO and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controllers of XPO, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge their duties, the officers, directors, and controllers of XPO were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Each Individual Defendant, by virtue of his or her position as a director, officer, and/or controlling shareholder, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controllers of XPO, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers,

directors, and/or controllers of the Company has been ratified by the remaining Individual Defendants who collectively comprised XPO's Board at all relevant times.

52.     As senior executive officers, directors, and controllers of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

53.     To discharge their duties, the officers and directors of XPO were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of XPO were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to XPO's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how XPO conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of XPO and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that XPO's operations would comply with all applicable laws and XPO's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.      Each of the Individual Defendants further owed to XPO and the shareholders the duty of loyalty requiring that each favor XPO's interest and that of its shareholders over their own

while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55.     At all times relevant hereto, the Individual Defendants were the agents of each other and of XPO and were at all times acting within the course and scope of such agency.

56.     Because of their advisory, executive, managerial, directorial, and controlling positions with XPO, each of the Individual Defendants had access to adverse, non-public information about the Company.

57.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by XPO.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

59.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

60.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually

took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of XPO, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of XPO and was at all times acting within the course and scope of such agency.

## XPO'S CODE OF CONDUCT

63.     The Company's Code of Business Ethics (the "Code of Conduct") states that "[e]veryone at our company is held to the same high standards: our management, board of directors, employees, suppliers and business partners. This makes it easier for us to meet our obligations as a team. The Code also serves to communicate our integrity to the business community and the public at large."

64.     The Code of Conduct provides that the Company is committed to "maintaining the trust of customers and others in our marketplaces by acting with integrity, competing fairly, and protecting confidential information." In connection with the Company's commitment to convey honest and accurate information, the Code of Conduct maintains that XPO's business capabilities are accurately portrayed, stating in relevant part, "XPO accurately portrays its business

capabilities. You may not make false or misleading statements about XPO's services or those of our competitors; you should never knowingly misrepresent facts to gain a competitive advantage or for any other purpose."

65.     The Code of Conduct states that XPO complies with the laws of all relevant governments that it does business with, stating that when dealing with a government entity or official, Company employees, officers, and/or directors may not "[m]ake false or misleading statements about XPO's services or capabilities." Further, the Code of Conduct states that:

> XPO complies with all laws and regulations that govern dealings with federal, state, provincial, county and local governments, including entities working on behalf of a government, or owned or controlled by a government. If you are involved in seeking government contract work for XPO, it is particularly important for you to understand and observe all applicable rules. If you have questions or concerns regarding our government contract obligations, contact the Compliance Office or the internal legal counsel for your location or business unit.

66.     The Code of Conduct also emphasizes that XPO complies with all laws and regulations governing international trade, stating in relevant part:

> XPO does not permit the export or import of goods, services or data without appropriate authorization. When shipping under a government authorization, you must comply with all terms and conditions of the authorization and you cannot divert shipments to a place or person not included in the authorization. To ensure that the company can comply with government reporting requirements relating to international trade, you must properly document all export and import transactions.

67.     The Code of Conduct outlines under a section titled "Protection of Company Assets" that, "[w]e are committed to safeguarding the integrity of XPO's assets, including the information we receive from or provide to shareholders, regulators, business partners and other third parties. We avoid conflicts of interest and we do business on our merits." In the same section, the Code of Conduct states that all public reports must be accurate, timely, and complete, stating in relevant part:

Our company's senior financial officers must ensure that all financial information disclosed in public communications and in periodic reports with the U.S. Securities and Exchange Commission is complete, accurate, timely and understandable. Persons responsible for preparing such documents must ensure that all accounting records, and the reports produced from such records, fairly and accurately represent the transactions to which they relate. These records and reports must include reasonable detail and be supported by appropriate documentation. If you become aware of anything in the company's accounting records or reports that is false or misleading, inform the company's Chief Legal Officer immediately.

68.     The Code of Conduct also states XPO's commitment to workplace safety. Specifically, the Code of Conduct provides that XPO complies with all laws that govern fair employment and labor practices, stating in relevant part:

**Equal Employment Opportunity**
XPO provides equal employment opportunities to all employees and applicants. We make employment decisions without regard to race, color, age, gender, religion, national origin, mental or physical disability, medical condition, family or medical leave status, marital status, sexual orientation, gender identity, or any other basis protected by law. This includes decisions related to hiring, placement, promotion, termination, discipline, leaves of absence, compensation, benefits and training.

**No Discrimination or Harassment**
XPO does not tolerate harassment or discrimination on the basis of any protected category or class. You must not engage in any abusive, harassing or offensive conduct, whether verbal, physical or visual. If you experience or become aware of any conduct that makes you uncomfortable, you should contact your supervisor, your Human Resources representative or the Compliance Office. If you have any questions regarding our company's policies prohibiting harassment and discrimination, consult XPO's No Discrimination, Harassment or Retaliation Policy.

**Workplace Safety**
XPO is committed to maintaining a safe work environment. All work must be performed in accordance with health and safety regulations and company policies. Immediately alert your supervisor to hazardous conditions in the workplace, vehicle accidents, work-related injuries or illnesses, violations of company policy and all other safety issues.

69.     Additionally, XPO has adopted a "Business Ethics Policy" which promises "No Discrimination, Harassment or Retaliation" and outlines prohibited conduct at Company

subsidiaries, divisions, and other operating entities.[7] The Business Ethics Policy specifically prohibits harassment, stating in relevant part:

> *Prohibited Harassment*: Conduct including, but not limited to, the following: • Verbal statements such as epithets, derogatory jokes or comments, slurs or unwanted sexual advances, invitations or comments;
>
> > • Visual displays such as derogatory and/ or sexually-oriented posters, photography, cartoons, drawings or gestures;
> > • Physical conduct including assault, unwanted touching, intentionally blocking normal movement or interfering with work because of sex, race or any other Protected Category;
> > • Threats and demands to submit to sexual requests as a condition of continued employment, or to avoid some other loss and offers of employment benefits in return for sexual favors;
> > • Communication via electronic media of any type that includes any conduct that is prohibited by state and/or federal law, or by company policy. Company systems shall not be used to transmit vulgar, profane, insulting, obscene or harassing messages.
>
> *Prohibited Retaliation*: Taking any adverse action against an individual for reporting, filing, testifying, assisting or participating in any manner in any investigation, proceeding or hearing conducted by the Company or a federal or state enforcement agency.

70.    The Business Ethics Policy makes furthers promises about XPO's culture and business practices, including that XPO has a "Speak-up Culture" and does not retaliate, that the Company will investigate and addresses concerns raised, and that the Company will take appropriate remedial action.

71.    The Individual Defendants violated the Code of Conduct and its Business Ethics Policy by allowing the Company to engage in the Workplace Misconduct, causing the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

---

[7] https://ethics.xpo.com/static/pdf/No_Discrimination_Harassment_or_Retaliation_Policy/XPO_DHR_2018_en-US.pdf. Last Visited May 2, 2019.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

72.     XPO purports to be a top ten global provider of cutting-edge supply chain solutions to the most successful companies in the world. The Company derives its revenue from a variety of sectors in which it operates, including retail, e-commerce, food and beverage, consumer packaged goods and industrial. The Company has two reportable segments, Transportation and Logistics. XPO mainly operates as a transportation service company, providing services to multiple countries through its reportable segments. Prior to Defendants Jacobs' control, the Company was known as Express-1 Expediated Solutions, Inc. Before XPO, Defendant Jacobs held a variety of high-level positions at a number of companies, including UWS and URI. Both companies have been under fire in recent years for their involvement in accounting fraud.

73.     In September 2011, Defendant Jacobs, through JPE, took 71% ownership of the Company and proceeded to execute an aggressive acquisition strategy, in line with his overall business reputation at the time; Defendant Jacobs had built himself up as a billionaire through "buying company after company[.]"[8]

74.     Under Defendant Jacobs' leadership, XPO carried out a series of acquisitions between 2011 and 2015 including UX Specialized Logistics (2/9/2015), Bridge Terminal Transport Inc. (5/4/2015), and Norbert Dentressangle (6/9/2015). The Company's aggressive M&A Strategy was widely promulgated, and the Company grew immensely shortly after Defendant Jacobs took control, "from $177 million in sales in 2011 to $17 billion[.]" Indeed, in

---

[8] https://www.bloomberg.com/news/articles/2019-02-19/xpo-s-billionaire-dealmaker-hits-m-a-brakes-turns-to-buybacks. Last visited May 2, 2019.

line with its M&A Strategy, in August 2017, Defendant Jacobs announced plans to spend an additional $7 to $8 billion for acquisitions.[9]

**The Workplace Misconduct**

75.     During the Relevant Period, workplace misconduct complaints began surfacing against XPO stemming from conduct tracing back to late 2014 related to, *inter alia*, excessive heat, sexual harassment, misclassifying drivers as independent contractors as opposed to employees, failing to pay overtime wages and proper employee benefits, and miscarriages experienced by pregnant workers who were denied reasonable accommodation at one of XPO's warehouses, New Breed Logistics.

76.     In 2017, the California Labor Commissioner's Office awarded four XPO truck drivers $855,000 in back wages after finding that XPO had misclassified them as independent contractors.[10]

77.     Furthermore, eight women claimed that they had been sexually harassed at an XPO-operated facility in Memphis by a number of different XPO supervisors between October 2014 and March 2018.[11]

78.     According to an investigation conducted by *The New York Times* in October 2018, the list of egregious employee mistreatment included allegations of pregnancy discrimination and claims that XPO supervisors required workers to continue working even when one employee fell to the floor dead from cardiac arrest.[12] The article stated specifically that "last October [2017], a

---

[9] https://www.wsj.com/articles/xpo-logistics-may-spend-up-to-8-billion-on-acquisitions-1501714083. Last visited May 3, 2019.

[10] https://www.nytimes.com/interactive/2018/10/21/business/pregnancy-discrimination-miscarriages.html. Last visited May 2, 2019.

[11] https://www.theguardian.com/us-news/2018/may/23/eight-women-allege-sexual-harassment-at-xpo-logistics-warehouse-in-memphis. Last visited May 2, 2019.

[12] https://www.nytimes.com/interactive/2018/10/21/business/pregnancy-discrimination-miscarriages.html. Last visited May 2, 2019.

58-year-old woman died of cardiac arrest on the warehouse floor after complaining to colleagues that she felt sick, according to a police report and current and former XPO employees. In Facebook posts at the time and in recent interviews, employees said supervisors told them to keep working as the woman lay dead."

79.     The allegations of workplace misconduct at XPO also raised political attention. In December 2018, ninety-seven members of the House of Representatives called for a congressional investigation into working conditions at XPO's Memphis warehouse, where several miscarriages occurred.[13] In February 2019, the Company announced it would be closing its Memphis facility, resulting in hundreds of layoffs. According to one XPO employee: "'[t]he warehouse is closing because management chose to run this place like it's their personal plantation, rather than running it like it's a company,' she said Thursday."[14]

80.     In addition, according to the Company's most recent 10-Q filed with the SEC on May 1, 2019, there were numerous cases pending in California federal courts filed by XPO workers against the Company alleging, *inter alia*, that the Company misclassified them as independent contractors rather than employees, failed to pay overtime wages, and/or failed to provide meal and rest periods.

81.     In breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls and caused and/or failed to prevent the Company's engagement in the Workplace Misconduct described herein.

### **False and Misleading Statements**

### *February 26, 2014 Form 10-K*

---

[13] https://www.wsj.com/articles/house-members-seek-probe-into-xpo-logistics-worker-treatment-1543960304. Last visited May 2, 2019.
[14] https://www.nytimes.com/2019/02/14/business/xpo-verizon-warehouse-pregnancy-discrimination.html. Last visited May 2, 2019.

82.     On February 26, 2014 the Company filed with the SEC its annual report for the fiscal year ended December 31, 2013 on a Form 10-K (the "2013 10-K"), which was signed by Defendants Jacobs, Hardig, Jesselson, Kingshott, Papastavrou, and Shaffer.

83.     The 2013 10-K included XPO's financial results for the fiscal year ended December 31, 2013 and promoted the Company's M&A Strategy, stating in relevant part:

> ***Acquisitions.*** We take a disciplined approach to acquisitions: we develop and maintain an active pipeline of targets by looking for companies that are highly scalable and are a good strategic fit with our core competency. When we acquire a company, we seek to integrate it with our operations and scale it up by adding salespeople. We integrate the acquired operations with our technology platform, which connects them to our broader organization, and we give them access to our shared carrier pool. We gain more carriers, customers, lane histories and pricing histories with each acquisition, and in some cases an acquisition adds complementary services. We capitalize on these resources Company-wide to buy transportation more efficiently and to cross-sell a more complete supply chain solution to customers. In 2012, we completed the acquisition of four non-asset third party logistics companies. We acquired another six companies in 2013, including 3PD, the largest non-asset, third party provider of heavy goods, last-mile logistics in North America, and NLM, the largest provider of web-based expedited transportation management in North America. On January 5, 2014, we agreed to acquire Pacer International, Inc., a Tennessee corporation ("Pacer"), the third largest provider of intermodal transportation services in North America. We plan to continue to acquire quality companies that fit our strategy for growth.

84.     The 2013 10-K included the following table, which represented the Company's debt obligations (in thousands) as of December 31, 2013 and 2012:

| | Interest rates | Term (months) | As of December 31, 2013 | As of December 31, 2012 |
|---|---|---|---|---|
| Convertible senior notes | 4.50% | 60 | $ 133,742 | $ 143,750 |
| Revolving credit facility | 3.63% | 60 | 75,000 | — |
| Notes payable | N/A | N/A | 2,205 | 863 |
| Capital leases for equipment | 14.02% | 59 | 196 | 154 |
| Line of credit | 5.00% | N/A | — | 150 |
| Total debt | | | 211,143 | 144,917 |
| Less: unamortized bond discount and debt issuance costs | | | 27,474 | 35,470 |
| Less: current maturities of long-term debt | | | 2,028 | 491 |
| Total long-term debt, net of current maturities | | | $ 181,641 | $ 108,956 |

85.     Attached to the 2013 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Jacobs and Hardig attesting to the accuracy of the 2013 10-K.

***April 25, 2014 Proxy Statement***

86.     The Company filed its Schedule 14A with the SEC on April 25, 2014 (the "2014 Proxy Statement"). Defendants Jacobs, Jesselson, Kingshott, Papastavrou, and Shaffer solicited the 2014 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[15]

87.     The 2014 Proxy Statement stated, regarding the Company's Code of Conduct, that,

[w]e have a Code of Business Conduct and Ethics that applies to all directors and employees, including our senior management team. In addition, our Board adopted the Senior Officer Code of Business Conduct and Ethics, which is applicable exclusively to our senior management team. These codes are designed to deter wrongdoing, to promote the honest and ethical conduct of all employees and to promote compliance with applicable governmental laws, rules and regulations.

88.     The 2014 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the Workplace Misconduct, the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

89.     The Individual Defendants also caused the 2014 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to link pay to performance, in order to "to align the interests of our executive management with the interests of

---

[15] Plaintiff's allegations with respect to the misleading statements in the 2014 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

our stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

90.     The 2014 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company's widely promoted M&A Strategy generated nominal returns to XPO; (2) the Company's financial statements were prepared with improper accounting methods employed to disguise the true state of the Company's financial condition, such as under-reporting bad debts and aggressive amortization assumptions; and (3) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### February 23, 2015 Form 10-K

91.     On February 23, 2015 the Company filed with the SEC its annual report for the fiscal year ended December 31, 2014 on a Form 10-K (the "2014 10-K"), which was signed by Defendants Jacobs, Hardig, Jesselson, Kingshott, Papastavrou, and Shaffer.

92.     The 2014 10-K reported XPO's operating and financial results, recording $63.6 million in net loss, $2.00 per diluted share on $2.36 billion in revenue. The previous year, the Company had reported a net loss of $48.53 million on revenue of $702.3 million.

93.     The 2014 10-K also promoted the Company's M&A Strategy, outlining the strategy's three main components, one being acquisitions. Specifically, the 2014 10-K described XPO's approach to acquisitions and listed several of the companies acquired by XPO since 2012, including New Breed, which the Company acquired in September 2014. The 2014 10-K stated in relevant part:

> *Acquisitions.* We take a disciplined approach to acquisitions: we look for companies that are highly scalable and are a good strategic fit with our core competencies. When we acquire a company, we seek to integrate it with our operations by moving the acquired operations onto our technology platform that

connects our broader organization. We gain more carriers, customers, lane histories and pricing histories with each acquisition, and some acquisitions add complementary services. We use these resources company-wide to buy transportation more efficiently and to cross-sell a more complete supply chain solution to customers. In 2012, we completed the acquisition of four non-asset, third-party logistics companies. We acquired another six companies in 2013, including 3PD, the largest non-asset, third-party provider of last mile logistics for heavy goods in North America, and National Logistics Management ("NLM"), the largest provider of web-based expedited transportation management in North America. On March 31, 2014, we acquired Pacer, the third largest provider of intermodal transportation services in North America. On July 28, 2014, we acquired last mile logistics company ACL. We completed our acquisition of contract logistics company New Breed on September 2, 2014. On February 9, 2015, we acquired substantially all of the assets of last mile logistics company UX Specialized Logistics ("UX"). We have an active pipeline of key targets, and we plan to continue acquiring quality companies that fit our strategy for growth.

94.    The 2014 10-K also provided the table below, which disclosed the Company's debt obligations as of December 31, 2014 and December 31, 2013 (in millions):

| | Interest rates | Term (months) | As of December 31, 2014 | As of December 31, 2013 |
|---|---|---|---|---|
| Senior notes due 2019 | 7.88% | 60 | $ 500.0 | $ — |
| Convertible senior notes | 4.50% | 60 | 106.8 | 133.7 |
| Revolving credit facility | 4.38% | 60 | — | 75.0 |
| Notes payable | N/A | N/A | 1.8 | 2.2 |
| Capital leases for equipment | 14.22% | 59 | 0.2 | 0.2 |
| Total debt | | | 608.8 | 211.1 |
| Less: unamortized discount on convertible senior notes | | | (14.9) | (27.4) |
| Less: current maturities of long-term debt | | | (1.8) | (2.0) |
| Total long-term debt, net of current maturities | | | $ 592.1 | $ 181.7 |

95.    In addition, the 2014 10-K included a table with estimated future amortization expenses "for amortizable intangible assets for the next five years" (in millions). Specifically, the 2014 10-K maintained that the Company estimated amortization expenses of $66 million for 2015, $52.2 million for 2016, $41.3 million for 2017, $38.8 million for 2018, and $37.1 million for 2019. The 2014 10-K also stated that XPO recorded intangible asset amortization expenses of "$62.5

million, $14.1 million and $1.3 million for the years ended December 31, 2014, 2013 and 2012 respectively."

96.     Attached to the 2014 10-K were SOX certifications signed by Defendants Jacobs and Hardig attesting to the accuracy of the 2014 10-K.

### *April 8, 2015 Proxy Statement*

97.     The Company filed its Schedule 14A with the SEC on April 8, 2015 (the "2015 Proxy Statement"). Defendants Jacobs, Jesselson, Kingshott, Papastavrou, and Shaffer solicited the 2015 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[16]

98.     The 2015 Proxy Statement stated, regarding the Company's Code of Conduct, that,

[w]e have a Code of Business Conduct and Ethics that applies to all directors and employees, including our senior management team. In addition, our Board adopted the Senior Officer Code of Business Conduct and Ethics, which is applicable exclusively to our senior management team. These codes are designed to deter wrongdoing, to promote the honest and ethical conduct of all employees and to promote compliance with applicable governmental laws, rules and regulations.

99.     The 2015 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the Workplace Misconduct, the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

100.    The Individual Defendants also caused the 2015 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to link pay to performance, in order to "to align the interests of our executive management with the interests of

---

[16] Plaintiff's allegations with respect to the misleading statements in the 2015 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

our stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

101.    The 2015 Proxy Statement also failed to disclose, *inter alia,* that: (1) the Company's widely promoted M&A Strategy generated nominal returns to XPO; (2) the Company's financial statements were prepared with improper accounting methods employed to disguise the true state of the Company's financial condition, such as under-reporting bad debts and aggressive amortization assumptions; and (3) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *February 29, 2016 Form 10-K*

102.    On February 29, 2016 the Company filed with the SEC its annual report for the fiscal year ended December 31, 2015 on a Form 10-K (the "2015 10-K"), which was signed by Defendants Jacobs, Hardig, DeJoy, Jesselson, Kingshott, Papastavrou, and Shaffer. The 2015 10-K reported a net loss of $191.1 million on revenue of $7.62 billion, and for 2015, as noted above, the 2015 10-K also recorded $63.6 million net loss on revenue of $2.36 billion.

103.    The 2015 10-K also outlined XPO's debt as of December 31, 2015 and 2014 in the following table:

| *(Dollars in millions)* | Stated Interest Rates | Initial Term (months) | As of December 31, 2015 | As of December 31, 2014 |
|---|---|---|---|---|
| ABL Facility | 2.64% | 60 | $ — | $ — |
| Senior Notes due 2022 | 6.50% | 84 | 1,600.0 | — |
| Senior Notes due 2021 | 5.75% | 72 | 544.4 | — |
| Senior Notes due 2019 | 7.88% | 60 | 900.0 | 500.0 |
| Senior Notes due 2018 | 7.25% | 120 | 265.8 | — |
| Term loan facility | 5.50% | 72 | 1,600.0 | — |
| Senior Debentures due 2034 | 6.70% | 360 | 300.0 | — |
| Convertible senior notes | 4.50% | 60 | 52.3 | 106.8 |
| Euro Private Placement Notes due 2020 | 4.00% | 84 | 13.1 | — |
| Asset financing [a] | 1.38% | 67 | 262.5 | — |

| | | | | |
|---|---|---|---|---|
| Notes payable | Various | Various | 3.5 | 1.8 |
| Capital leases for equipment | 1.40% | 70 | 59.1 | 0.2 |
| Total debt | | | 5,600.7 | 608.8 |
| Plus: unamortized premium on Senior Notes due 2019 | | | 13.2 | — |
| Plus: unamortized fair value premium on Senior Notes due 2018 | | | 2.4 | — |
| Plus: unamortized fair value premium on Euro Private Placement Notes | | | 1.4 | — |
| Less: unamortized fair value discount on Senior Debentures due 2034 | | | (101.0) | — |
| Less: unamortized discount on convertible senior notes | | | (4.3) | (14.9) |
| Less: unamortized discount on term loan facility | | | (31.5) | — |
| Less: current maturities of long-term debt | | | (135.3) | (1.8) |
| Less: debt issuance costs | | | (73.0) | $ (11.8) |
| Total long-term debt, net of current maturities | | | $ 5,272.6 | $ 580.3 |

[a] The stated interest rate and initial term (in months) for the asset financing is the weighted-average stated interest rate and initial term (in months), respectively.

104.    In addition, the 2015 10-K estimated future amortization expenses for the following five years (in millions) as follows: $201.3 in 2016, $187.4 in 2017, $179.0 in 2018, $172.7 in 2019, and $166.6 in 2020.

105.    Attached to the 2015 10-K were SOX certifications signed by Defendants Jacobs and Hardig attesting to the accuracy of the 2015 10-K.

*April 6, 2016 Proxy Statement*

106.    The Company filed its Schedule 14A with the SEC on April 6, 2016 (the "2016 Proxy Statement"). Defendants Jacobs, Ashe, DeJoy, Jesselson, Kingshott, Papastavrou, and Shaffer solicited the 2016 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[17]

---

[17] Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter,

107.    The 2016 Proxy Statement stated, regarding the Company's Code of Conduct, that,

[w]e have a Code of Business Conduct and Ethics that applies to all directors and employees, including our senior management team. In addition, our Board adopted the Senior Officer Code of Business Conduct and Ethics, which is applicable exclusively to our senior management team. These codes are designed to deter wrongdoing, to promote the honest and ethical conduct of all employees and to promote compliance with applicable governmental laws, rules and regulations, as well as to provide clear channels for reporting concerns.

108.    The 2016 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the Workplace Misconduct, the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

109.    The Individual Defendants also caused the 2016 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to strongly correlate pay and performance, in order to "to align the interests of our executive team with the interests of our stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

110.    The 2016 Proxy Statement also failed to disclose, *inter alia,* that: (1) the Company's widely promoted M&A Strategy generated nominal returns to XPO; (2) the Company's financial statements were prepared with improper accounting methods employed to disguise the true state of the Company's financial condition, such as under-reporting bad debts and aggressive amortization assumptions; and (3) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

*February 28, 2017 Form 10-K*

---

or recklessness with regard to these allegations and related claims.

111.    On February 28, 2017 the Company filed with the SEC its annual report for the fiscal year ended December 31, 2016 on a Form 10-K (the "2016 10-K"), which was signed by all of the Individual Defendants. The 2016 10-K reported net loss of $69 million on revenue of $14.62 billion and further outlined XPO's debt and financial liabilities (in millions) in the following table as follows:

| (In millions) | December 31, 2016 | | | | December 31, 2015 | | | |
| | Principal Balance | Carrying Value | Fair Value | | Principal Balance | Carrying Value | Fair Value | |
| | | | Level 1 | Level 2 | | | Level 1 | Level 2 |
| ABL Facility | $ 30.0 | $ 30.0 | $ — | $ 30.0 | $ — | $ — | $ — | $ — |
| Senior Notes due 2023 | 535.0 | 527.1 | 560.4 | — | — | — | | |
| Senior Notes due 2022 | 1,600.0 | 1,579.9 | 1,689.4 | — | 1,600.0 | 1,577.0 | 1,479.8 | — |
| Senior Notes due 2021 | 527.1 | 520.7 | 546.0 | — | 544.4 | 536.6 | | 507.5 |
| Senior Notes due 2019 | — | — | — | — | 900.0 | 900.4 | 920.3 | |
| Senior Notes due 2018 | 265.8 | 267.1 | 274.0 | — | 265.8 | 268.2 | | 271.0 |
| Term loan facility | 1,481.9 | 1,439.2 | — | 1,507.1 | 1,600.0 | 1,540.3 | — | 1,590.0 |
| Senior Debentures due 2034 | 300.0 | 200.8 | 241.6 | — | 300.0 | 199.0 | — | 201.0 |
| Convertible senior notes | 49.4 | 47.1 | 129.8 | — | 52.3 | 46.8 | 89.1 | — |
| Euro private placement notes due 2020 | 12.6 | 13.7 | — | 14.0 | 13.1 | 14.5 | — | 13.9 |
| Asset financing | 145.0 | 145.0 | 145.0 | — | 266.0 | 266.0 | 266.0 | — |
| Capital leases for equipment | 97.4 | 97.4 | — | 97.4 | 59.1 | 59.1 | — | 59.1 |
| Total debt | $ 5,044.2 | $ 4,868.0 | | | $ 5,600.7 | $ 5,407.9 | | |
| Current maturities of long-term debt | 138.9 | 136.5 | | | 133.9 | 135.3 | | |
| Long-term debt | $ 4,905.3 | $ 4,731.5 | | | $ 5,466.8 | $ 5,272.6 | | |

The Level 1 debt was valued using quoted prices in active markets. The Level 2 debt was valued using bid evaluation pricing models or quoted prices of securities with similar characteristics. The fair value of the asset financing arrangements approximates carrying value since the debt is primarily issued at a floating rate, may be prepaid any time at par without penalty and the remaining life is short-term in nature.

112.    The 2016 10-K also noted the estimated future amortization expenses for amortizable intangible assets for the following five years (in millions) as follows: $161.0 in 2017, $153.5 in 2018, $147.4 in 2019, $141.4 in 2020, and $134.1 in 2021. In addition, the 2016 10-K included the following disclosure:

As of December 31, 2016, we had $342.0 million of working capital, including cash and cash equivalents of $373.4 million, compared to working capital of $262.8 million, including cash and cash equivalents of $289.8 million, as of December 31, 2015. This increase of $79.2 million in working capital during the period was mainly due to an increase in cash and accounts receivable, partially offset by an increase in accrued expenses.

We continually evaluate our liquidity requirements, capital needs and the availability of capital resources based on our operating needs and our planned growth initiatives. In addition to using existing cash balances and net cash provided by operating activities, in certain circumstances we may use debt financings and issuances of equity or equity-related securities to fund our operating needs and growth initiatives. We believe that cash generated from operations, our existing cash balance, and availability of capacity to draw down under our ABL Facility will be sufficient to support our existing operations over the next 12 months.

113.    Attached to the 2016 10-K were SOX certifications signed by Defendants Jacobs and Hardig attesting to the accuracy of the 2016 10-K.

### April 17, 2017 Proxy Statement

114.    The Company filed its 2017 Proxy Statement with the SEC on April 17, 2017. Defendants Jacobs, Ashe, DeJoy, Jesselson, Kingshott, Papastavrou, and Shaffer solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[18]

115.    The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[w]e have a Code of Business Ethics that applies to our directors and executive officers. This code is designed to deter wrongdoing, to promote the honest and ethical conduct of all employees and to promote compliance with applicable governmental laws, rules and regulations, as well as to provide clear channels for reporting concerns."

---

[18] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

116.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the Workplace Misconduct, the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

117.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to strongly correlate pay and performance, in order to "to align the interests of our executive team with the interests of our stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

118.    The 2017 Proxy Statement also failed to disclose, *inter alia,* that: (1) the Company's widely promoted M&A Strategy generated nominal returns to XPO; (2) the Company's financial statements were prepared with improper accounting methods employed to disguise the true state of the Company's financial condition, such as under-reporting bad debts and aggressive amortization assumptions; and (3) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *February 12, 2018 Form 10-K*

119.    On February 12, 2018 the Company filed with the SEC its annual report for the fiscal year ended December 31, 2017 on a Form 10-K (the "2017 10-K"), which was signed by all of the Individual Defendants. The 2017 10-K announced the Company's operating and financial results and reported net loss of $340.2 million, $2.45 per diluted share, on revenue of $15.38 billion—compared to $69 million recorded as net loss on revenue of $14.62 billion in 2016.

120.    The 2017 10-K summarized XPO's debt and valuation of financial liabilities in the table below as follows:

| (In millions) | December 31, 2017 | | December 31, 2016 | |
| --- | --- | --- | --- | --- |
| | Principal Balance | Carrying Value | Principal Balance | Carrying Value |
| ABL Facility | $        100.0 | $      100.0 | $        30.0 | $      30.0 |
| Term loan facility | 1,494.0 | 1,455.6 | 1,481.9 | 1,439.2 |
| 6.125% Senior Notes due 2023 | 535.0 | 528.0 | 535.0 | 527.1 |
| 6.50% Senior Notes due 2022 | 1,600.0 | 1,583.0 | 1,600.0 | 1,579.9 |
| 5.75% Senior Notes due 2021 | — | — | 527.1 | 520.7 |
| 7.25% Senior Notes due 2018 | — | — | 265.8 | 267.1 |
| 6.70% Senior Debentures due 2034 | 300.0 | 202.8 | 300.0 | 200.8 |
| 4.50% Convertible senior notes | — | — | 49.4 | 47.1 |
| 4.00% Euro private placement notes due 2020 | 14.4 | 15.3 | 12.6 | 13.7 |
| European Trade Securitization Program | 302.6 | 298.6 | — | — |
| Asset financing | 90.0 | 90.0 | 145.0 | 145.0 |
| Capital leases for equipment | 247.9 | 247.9 | 97.4 | 97.4 |
| Total debt | 4,683.9 | 4,521.2 | 5,044.2 | 4,868.0 |
| Current maturities of long-term debt | 103.7 | 103.7 | 138.9 | 136.5 |
| Long-term debt | $     4,580.2 | $   4,417.5 | $   4,905.3 | $   4,731.5 |

The fair value of the debt at December 31, 2017 was $4,816.1 million, of which $2,647.4 million was classified as Level 1 and $2,168.7 million was classified as Level 2 in the fair value hierarchy. The fair value of the debt at December 31, 2016 was $5,234.7 million, of which $3,586.2 million was classified as Level 1 and $1,648.5 million was classified as Level 2. The Level 1 debt was valued using quoted prices in active markets. The Level 2 debt was valued using bid evaluation pricing models or quoted prices of securities with similar characteristics. The fair value of the asset financing arrangements approximates carrying value since the debt is primarily issued at a floating rate, may be prepaid any time at par without penalty, and the remaining life is short-term in nature.

121.    Additionally, the 2017 10-K estimated future amortization expenses for amortizable intangible assets for the following five years (in millions) as follows: $160.5 in 2018, $154.0 in 2019, $147.9 in 2020, $140.3 in 2021, $130.3 in 2022, and $702.4 thereafter.

122.    The 2017 10-K included the following disclosure:

As of December 31, 2017, we had availability under the ABL Facility of $655.4 million. As of December 31, 2017, we had $590.8 million of working capital, including cash and cash equivalents of $396.9 million, compared to working capital of $342.0 million, including cash and cash equivalents of $373.4 million, as of December 31, 2016. This increase of $248.8 million in working capital during the period was mainly due to higher sales that resulted in increased accounts receivable,

partially offset by an increase in accrued expenses largely related to higher performance-based compensation.

We continually evaluate our liquidity requirements, capital needs and the availability of capital resources based on our operating needs and our planned growth initiatives. We believe that our existing sources of cash will be sufficient to support our existing operations over the next 12 months.

123.   Attached to the 2017 10-K were SOX certifications signed by Defendants Jacobs and Hardig attesting to the accuracy of the 2017 10-K.

124.   The statements in ¶¶ 82-85, 91-96, 102-105, 111-113, and 119-123 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose and caused the Company to fail to disclose, *inter alia*, that: (1) the Company's widely promoted M&A Strategy generated nominal returns to XPO; (2) the Company's financial statements were prepared with improper accounting methods employed to disguise the true state of the Company's financial condition, such as under-reporting bad debts and aggressive amortization assumptions; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### April 18, 2018 Proxy Statement

125.   The Company filed its 2018 Proxy Statement with the SEC on April 18, 2018. Defendants Jacobs, Ashe, DeJoy, Jesselson, Kingshott, Papastavrou, and Shaffer solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[19]

---

[19] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter,

126.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[w]e have a Code of Business Ethics that applies to our directors and executive officers. This code is designed to deter wrongdoing, to promote the honest and ethical conduct of all employees and to promote compliance with applicable governmental laws, rules and regulations, as well as to provide clear channels for reporting concerns."

127.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the Workplace Misconduct, the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

128.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to strongly correlate pay and performance, in order to "to align the interests of our [non-executive officers] with the interests of our stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

129.    The 2018 Proxy Statement also failed to disclose, *inter alia,* that: (1) the Company's widely promoted M&A Strategy generated nominal returns to XPO; (2) the Company's financial statements were prepared with improper accounting methods employed to disguise the true state of the Company's financial condition, such as under-reporting bad debts and aggressive amortization assumptions; and (3) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

---

or recklessness with regard to these allegations and related claims.

### The Truth Begins to Emerge

130.     On December 12, 2018, Spruce Point Capital Management LLC published the Spruce Report. The Spruce Report asserted that an investigation into the Company had revealed alarming concerns about how XPO had been operating its business and reporting its financial condition in its SEC filings. Specifically, the Spruce Report revealed that the Company's highly touted and aggressive M&A strategy had yielded minimal returns, that XPO's financial statements contained irregularities that suggested that the Company had utilized a number of improper accounting practices to hide the true nature of their financial state. The Spruce Report stated that XPO was:

> A Value Destructive Roll-Up, Covering Financial Strain and Dependent On Financing For Survival: XPO has completed 17 acquisitions since Jacobs took control in 2011 and deployed $6.1 billion of capital. Yet by our calculations, the Company has generated $73m of cumulative adjusted free cash flow in an expansionary economic period. In our view, this is indicative of a failed business strategy yielding a paltry 1.2% return on invested capital. XPO is dependent on external capital, asset sales, and factoring receivables to survive and is covering up a working capital crunch that can been seen by bank overdrafts . . . . As credit conditions tighten, cost of capital increases, and XPO's business practices come under greater scrutiny (eg. U.S. Senate), its share price could swiftly collapse in Enron-style fashion.

131.     The Spruce Report further asserted that XPO had utilized "Dubious Financial Presentation And Aggressive Accounting," stating in relevant part:

> Dubious Financial Presentation And Aggressive Accounting: In our opinion, XPO has used a nearly identical playbook from United Rentals leading up to its SEC investigation, executive felony convictions, and share price collapse. We find concrete evidence to suggest dubious tax accounting, under-reporting of bad debts, phantom income through unaccountable M&A earn-out liabilities, and aggressive amortization assumptions: all designed to portray glowing "Non-GAAP" results. Additionally, we provide evidence that its "organic revenue growth" cannot be relied upon, its free cash flow does not reflect its fragile financial condition, and numerous headwinds will pressure earnings.

132.     The Spruce Report uncovered that in an effort to exude exceptional Non-GAAP results, the Individual Defendants participated in a series of improper accounting practices to trick

the investing public into thinking that the Company was consistently meeting its earnings forecasts and analyst expectations. These improper accounting practices led to misstatements in the Company's SEC filings pertaining to its condition and operating results. Among the improper accounting practices identified by the Spruce Report was that XPO failed to appropriately value acquired assets. As per GAAP rules, the Company was required to identify certain acquired assets and connected liabilities from an acquired company based on the assets' respective fair value at the time of the acquisition. The Spruce Report asserted that XPO had understated equipment valuations and overstated income when undervalued equipment was resold, which led to inaccurate books, records, and financial statements and reports and overstated pre-income tax. Furthermore, the Spruce Report stated that the Company had co-mingled acquisition reserves with existing operating reserves which allowed XPO to offset normal operating costs and increase pre-tax income. Acquisition reserves left on the Company's books long after the allocation period enabled XPO to off-set bad debt expense after an acquisition. Rather than recording excess amounts resulting from acquired assets as goodwill, the Company improperly reported those excess amounts as income, which resulted in substantial pre-tax income overstatements.

133.     The Spruce Report contained a charted break-down comparing the questionable practices XPO engaged in with Defendant Jacobs' previous company, URI, which had been investigated by the SEC for fraudulent practices. The Spruce Report outlined the similarities between URI and XPO in the following chart, claiming that the concerns over XPO's financial statements "mirrored" issues uncovered with URI:

| Concern | Evidence | | Impact and Implication | URI Playbook |
| --- | --- | --- | --- | --- |

| | | | |
|---|---|---|---|
| **Non-Economic Value Destructive Roll-Up** | • Seventeen acquisitions since Jacobs took control of XPO, $6.1 billion of capital deployed, and generated just $73m of cumulative adjusted free cash flow = a failed business strategy yielding a 1.2% return on capital investment | • To continue its growth, XPO will be dependent on larger acquisitions and more external capital<br>• Rising interest rates and cost of capital will lower economic returns to the strategy | **YES** |
| **Dependent On Banks To Survive** | • XPO has raised $5 billion of debt and equity capital, and is resorting to increased asset sales and factoring of accounts receivables to bridge the financing gap | • $190m of financing costs to Wall Street, not including M&A advisory fees<br>• Can create incentives to appease banks before shareholders (evidence: forward | **YES** |
| **Growing Working Capital Crunch + Persistently Out of Cash** | • Moving to more capital intensive businesses (trucking/warehouses)<br>• XPO has repeatedly reported bank overdrafts and stopped reporting quarterly details in current liabilities<br>• Working capital to sales ratio climbs every quarter, while difference between DSO and DPOs contracting >>> Started factoring European accounts receivable in Q4'17 | • We believe XPO will be forced to continue to raise additional debt or equity capital<br>• A likely factor why XPO has failed to complete an acquisition in 2018 despite headlines in 2017 of its "$8 billion" capacity for deals | |
| **Organic Revenue Growth Not Reliable** | • Inability to reconcile XPO's historical stated organic growth, including calculation discrepancy in XPO's 2017 organic result<br>• Questionable Non-GAAP adjustment to FX impact<br>• Despite YTD quarterly avg organic growth of 10.8%, cash flow growth increased by just 3.2% | • The CEO has stressed organic sales growth is one of the biggest factors that investors use to value XPO. This creates possible incentives for XPO to inflate this metric | |

| | | | |
|---|---|---|---|
| **Adj. EBITDA And Earnings Quality Concerns Make XPO More Levered Than It Appears** | • XPO has repeatedly stretched out amortization assumptions<br>• Reports significantly increased non-operating pension gains<br>• Labels recurring M&A and restructuring costs as EBITDA add-backs despite these being material costs of executing its roll-up strategy<br>• Includes 100% of XPO Europe as EBITDA despite owning 87%<br>• Dependence on operating leases will move on balance sheet in 2019<br>• In Q3'18, XPO shifted gains and losses on asset sales from "other income" into operating results, without providing $ details | • EBITDA is another important financial metric investors focus on. We estimate leverage of Net Debt/Adj EBITDAR is close to 3x<br>• **URI case cited improper accounting for customer relationships, while we observe XPO consistently stretching out assumptions for customer relationship** | **YES** |

134.    The chart continued to track the similarities between URI's "playbook" and the conduct taken by XPO during the Relevant Period. (*See* Chart Continued Below).

| Concern | Evidence | Impact and Implication | URI Playbook |
|---|---|---|---|
| **A/R Bad Debt Manipulation** | • Post Q2'15 acquisitions, XPO's allowance for bad debt as a % of gross receivables materially declined despite Norbert carrying a higher % of allowances, and has been growing every quarter<br>• XPO just started disclosing bad debt in Q3'18 MD&A | • XPO could have flushed bad debts and labelled them as acquisition costs to be ignored. **URI case cited improper A/R reserve manipulation to boost net income** | <span style="color:red">**YES**</span> |
| **Phantom Income Potential Through Unaccountable M&A Earn-Out Liability** | • XPO created a $29m earn-out liability on June 30, 2015 despite not disclosing any earn-out compensation for the three acquisitions during that period: UX Logistics, ND, or BTT<br>• The liability was reduced to zero, but XPO did not disclose cash payments or share issuance to satisfy the liability | • IF XPO followed standard earn-out accounting, it would reverse the liability and book $29m of income. **URI case cited improper acquisition reserves to offset expenses** | <span style="color:red">**YES**</span> |
| **Large Discrepancy Between Income Statement And Cash Tax Expense** | • XPO has recognized a cumulative income tax benefit of $132m since Jacob's joined, while paying $182m in actual cash taxes | • The discrepancy makes XPO's GAAP EPS less meaningful. We estimate the cumulative earnings benefit has been $1.55/share<br>• **The URI case cited improper tax accounting** | <span style="color:red">**YES**</span> |
| **Obscure Diluted Share Count** | • The perpetual preferred stock is convertible at $7/share, making it deeply in-the-money. In Q1'16 XPO stopped giving a clear picture to investors about the sources of potentially diluted securities – including 10.2m shares from the preferred stock | • Sell-side analysts have incorrectly modelled the share count, making XPO's valuation look cheaper than economic reality | |
| **Unjust Insider Enrichment on Questionable Metrics** | • XPO uses a non-standard definition of "adjusted cash flow per share" to earn significant bonus compensation<br>• The calculation ignores any measure of return on invested capital, which is common in the transportation/logistics industry | • XPO management enriching itself for non-economic value- added investing inc. special bonuses for completing deals (part of its job!). Employees and Unions (Teamsters) already calling out XPO management's | |

135.     The Spruce Report maintained that XPO presented a "flawed business model, questionable governance, egregious financial representation, increased regulatory scrutiny, and loss of confidence in management." The Spruce Report further stated that the Company failed to account for the earn out of certain acquisitions, resulting in reported phantom income of $29 million. The Spruce Report also noted that XPO had reported accelerated pension gains which increased EBITDA and pre-income tax as of January 2018—gains which were "non-operational and [could] be used to mask underlying weakness in XPO's core business."

136.     The Spruce Report stated that the Company was aggressively increasing amortization assumptions, had stopped disclosing carrier relationships and other intangibles in 2016 and 2017, and were possibly manipulating tax assumptions, pointing out that XPO had recognized 132 million income tax benefits since 2011, and paid 182 million in actual cash taxes, which reflected a "material divergence between XPO's Income Statement Taxes and Cash Taxes Paid."

137.     The Spruce Report also highlighted that XPO was under fire for labor violations and worker safety issues, including through multiple lawsuits filed by drivers alleging poor treatment and misclassification. The Spruce Report noted that, unlike its peers, XPO did not consider return on capital as a metric for determining and evaluating executive compensation,

138.     After a detailed analysis of the Company, the Spruce Report concluded that due to the concerns unveiled from probing into the Company, the future of the company looked bleak, stating in relevant part that "XPO has extracted no value (as measured by excess cash flow) from 17 acquisitions, while its two recent large deals have saddled it with bad debts, higher pension liabilities, and moved it toward greater capital intensity businesses. We do not see how XPO can conceivably trade at a valuation higher than the sum of its acquired parts."

139.     On this news, the price per share of Company stock fell $15.77, over 26% from the previous trading day, to close at $44.50 per share on December 13, 2018.

140.     While the Company touted in 2017 that it had $7-8 billion for acquisitions, the Individual Defendants were not only unable to deliver on that promise, but dramatically shifted XPO's business focus away from acquisitions.

141.     On an analyst call held on February 15, 2019, Defendant Jacobs announced that the Company would no longer be implementing the M&A Strategy, in contrast to the investing public's expectations, stating specifically: "The best M&A target is acquiring our own stock . . . . That's where we're going to deploy the resources for the foreseeable future, not on external M&A."[20]  (Internal quotations removed).

## DAMAGES TO XPO

142.     As a direct and proximate result of the Individual Defendants' conduct, XPO has lost and expended, and will lose and expend, many millions of dollars.

143.     Such expenditures include, but are not limited to, legal fees and payments associated with the lawsuits against the Company based on the Workplace Misconduct, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

144.     Such expenditures also include, but are not limited to, legal fees and payments associated with the Securities Class Action filed against the Company, its CEO and its former CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

145.     Such losses include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including

---

[20] https://www.bloomberg.com/news/articles/2019-02-19/xpo-s-billionaire-dealmaker-hits-m-a-brakes-turns-to-buybacks. Last visited May 3, 2019.

bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

146.    As a direct and proximate result of the Individual Defendants' conduct, XPO has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

147.    Plaintiff brings this action derivatively and for the benefit of XPO to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of XPO, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

148.    XPO is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

149.    Plaintiff is a current shareholder of XPO and has continuously held XPO common stock at all relevant times. Plaintiff will adequately and fairly represent the interests of XPO in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

150.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

151.    A pre-suit demand on the Board of XPO is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants

Jacobs, Ashe, Jesselson, Kingshott, Papastavrou, and Shaffer (the "Director-Defendants"), and

non-parties Marlene M. Colucci and AnnaMaria DeSalva (together with the Director-Defendants,

the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who

are on the Board at the time this action is commenced.

152.    Demand is excused as to all of the Director-Defendants because each one of them

faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make false and

misleading statements and omissions of material facts and to cause the Company to engage in the

Workplace Misconduct, which renders them unable to impartially investigate the charges and

decide whether to pursue action against themselves and the other perpetrators of the scheme.

153.    In complete abdication of their fiduciary duties, the Director-Defendants either

knowingly or recklessly participated in causing the Company to engage in the Workplace

Misconduct and in making and/or causing the Company to make the materially false and

misleading statements alleged herein. The fraudulent scheme to make false statements was, *inter

alia*, intended to make the Company appear more profitable and attractive to investors. As a result

of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial

likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

154.    Additional reasons that demand on Defendant Jacobs is futile follow. Defendant

Jacobs has served as the Company's CEO and Chairman of the Board since September 2011.

Defendant Jacobs is also the managing member of JPE and is a controlling shareholder of the

Company. Thus, as the Company admits, he is not only a non-independent director, but he has

substantial control over the Company (as the 2018 10-K admits). The Company provides

Defendant Jacobs with his principal occupation and he receives excessive compensation as

described above, including $13,327,471 during the fiscal year ended December 31, 2018. Defendant Jacobs was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing 10-Ks, which he signed and signed SOX certifications for. As the Company's highest officer, controlling shareholder, and as a trusted Company director, he conducted little, if any, oversight of the schemes to engage in the Workplace Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Jacobs is a defendant in the Securities Class Action. For these reasons, too, Defendant Jacobs breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant Ashe is futile follow. Defendant Ashe has served as a Company director since March 2016. She also serves as a member of the Audit Committee and Acquisition Committee. Defendant Ashe receives handsome compensation as described above. As a Company director and member of the Audit Committee she conducted little, if any, oversight of the Company's engagement in the Workplace Misconduct or the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Ashe signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K. For these reasons, too, Defendant Ashe breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

156.     Additional reasons that demand on Defendant Jesselson is futile follow. Defendant Jesselson has served as a Company director since September 2011. He also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Defendant Jesselson receives handsome compensation as described above. As a Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the Workplace Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Jesselson signed, and thus personally made the false and misleading statements in, all of the 10-Ks mentioned herein. For these reasons, too, Defendant Jesselson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.     Additional reasons that demand on Defendant Kingshott is futile follow. Defendant Kingshott has served as a Company director since September 2011. He also serves as Chairman of the Compensation Committee and as a member of the Acquisition Committee. Defendant Kingshott receives handsome compensation as described above. As a Company director, he conducted little, if any, oversight of the Company's engagement in the Workplace Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kingshott signed, and thus personally made the false and misleading statements in, all of the 10-Ks mentioned herein. For these reasons, too, Defendant Kingshott breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant Papastavrou is futile follow. Defendant Papastavrou has served as a Company director since September 2011. He also serves as a member of the Acquisition Committee, Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Defendant Papastavrou receives handsome compensation, as described above. As a Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the Workplace Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Papastavrou signed, and thus personally made the false and misleading statements in, all of the 10-Ks mentioned herein. For these reasons, too, Defendant Papastavrou breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Shaffer is futile follow. Defendant Shaffer has served as a Company director since September 2011. He also serves as Chairman of the Audit Committee. Defendant Shaffer receives handsome compensation, as described above. As a Company director and Chairman of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the Workplace Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Shaffer signed, and thus personally made the false and misleading statements in, all of the 10-Ks mentioned herein. For these reasons, too, Defendant Shaffer

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160. Additional reasons that demand on the Board is futile follow.

161. Demand is excused in this case because the Directors are beholden to and controlled by JPE and thus, Defendant Jacobs, as managing member of JPE, by virtue of JPE's controlling stake over the Company. As the Company admitted in its 2018 10-K, Defendant Jacobs' shareholdings provide him with significant control over the continued employment of the remaining Directors. In fact, many of the Directors were appointed to the Board in connection with Defendant Jacobs' purchase of control in September 2011.

162. Defendants Kingshott, Papastavrou, and Shaffer have ties to Defendant Jacobs' former company, URI, and were all appointed as directors when Defendant Jacobs purchased control over XPO in September 2011. For example, Defendant Papastavrou is a current director who serves on URI's Board of Directors and has served in that position since 2005. According to the Spruce Report, Defendant Kingshott was involved at Goldman Sachs MD when it did business with URI, and Defendant Shaffer sits on the Board of Directors at "Terex Corp," a company that was charged with aiding and abetting URI for the fraudulent transactions investigated by the SEC. Therefore, these Director-Defendants are unable to consider a demand with the requisite level of disinterestedness.

163. Defendants Ashe, Jesselson, Papastavrou, and Shaffer (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Audit Committee Charter, the Audit Committee Defendants bear responsibility for, *inter alia*, the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations. The Audit Committee Defendants failed to ensure the

integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to engage in improper accounting methods and to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

164.    Additionally, the Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and should have ensured that the Company maintained adequate financial oversight and internal controls over its disclosures and financial reporting to prevent the misconduct discussed herein. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

165.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to engage in and/or allow the Workplace Misconduct and to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

166.    XPO has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for XPO any part of the damages XPO suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

167.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

168.    The acts complained of herein constitute violations of fiduciary duties owed by XPO officers and directors, and these acts are incapable of ratification.

169.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of XPO. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of XPO, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

170.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause XPO to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

171.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

172.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

173.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

174.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

175.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

176.     Under the direction and watch of the Director-Defendants, the 2014, 2015, 2016, 2017 and 2018 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*: (1) the Company's widely promoted M&A Strategy generated nominal returns to XPO; (2) the Company's financial statements were prepared with improper accounting methods employed to disguise the true state of the Company's financial condition, such as under-reporting bad debts and aggressive amortization assumptions; and (3) the Company failed to maintain internal controls.

177.     The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to strongly correlate pay and performance, in order to "to align the interests of our executive team with the interests of our stockholders" while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

178.     The Proxy Statements also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations and make accurate and non-misleading public disclosures. By allowing the Workplace

Misconduct and engaging in issuing false and misleading statements to the investing public, the Individual Defendants violated the Code of Conduct. The Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

179.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

180.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Jacobs, Ashe, Jesselson, Kingshott, DeJoy, Papastavrou, and Shaffer, which allowed them to continue breaching their fiduciary duties to XPO.

181.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

182.    Plaintiff on behalf of XPO has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

183.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of XPO's business and affairs.

185.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

186. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of XPO.

187. In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly caused the Company to engage in or allow the Workplace Misconduct.

188. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

189. In further breach of their fiduciary duties owed to XPO, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (1) the Company's widely promoted M&A Strategy generated nominal returns to XPO; (2) the Company's financial statements were prepared with improper accounting methods employed to disguise the true state of the Company's financial condition, such as under-reporting bad debts and aggressive amortization assumptions; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

190. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

191. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public

statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

192.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

193.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

194.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, XPO has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

195.   Plaintiff on behalf of XPO has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

196.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, XPO.

198.    The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from XPO that was tied to the performance or artificially inflated valuation of XPO, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

199.    Plaintiff, as a shareholder and a representative of XPO, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

200.    Plaintiff on behalf of XPO has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

201.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal

investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

203.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

204.    Plaintiff on behalf of XPO has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of XPO, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to XPO;

(c)    Determining and awarding to XPO the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing XPO and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect XPO and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of XPO to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding XPO restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: May 24, 2019                                Respectfully submitted,

                                                   **FARNAN LLP**

                                                   /s/ Michael J. Farnan
Of Counsel:                                        Brian E. Farnan (Bar No. 4089)
                                                   Michael J. Farnan (Bar No. 5165)
**THE BROWN LAW FIRM, P.C.**                        919 N. Market St., 12th Floor
Timothy Brown                                      Wilmington, DE 19801
240 Townsend Square                                Telephone: (302) 777-0300
Oyster Bay, NY 11771                               Facsimile: (302) 777-0301
Tel: (516) 922-5427                                bfarnan@farnanlaw.com
Fax: (516) 344-6204                                mfarnan@farnanlaw.com
Email: tbrown@thebrownlawfirm.net


                                                   *Attorneys for the Plaintiff*